# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

NATIONAL RENAL ALLIANCE,  :
LLC, et al.,              :
                          :
       Plaintiffs,  :
                          :    CIVIL ACTION NO.
    v.                :    1:08-CV-0161-JOF
                          :
BLUE CROSS AND BLUE SHIELD :
OF GEORGIA, INC., et al.,  :
                          :
       Defendants.  :

## <u>OPINION AND ORDER</u>

This matter is before the court on Defendant's motion to dismiss [11] and Plaintiffs'

motion for leave to file surreply [17].

## I.    Background

### A.    Procedural History and Facts as Alleged in First Amended Complaint

Plaintiffs, National Renal Alliance, LLC, and affiliated entities,[1] filed suit against Defendant, Blue Cross & Blue Shield of Georgia, Inc.,[2] on January 15, 2008, alleging violations of the Employment Retirement Insurance Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*; the Medicare as Secondary Payer Act, 42 U.S.C. § 1395y(b)(3)(A); and state law claims of breach of contract, misrepresentation, unfair and deceptive trade practices, quantum meruit, and unjust enrichment, and violation of Georgia's statute governing Preferred Provider Organization plans. Plaintiffs amended their complaint on February 15, 2008. Thereafter, Defendant filed the instant motion to dismiss. The court held a hearing on Defendant's motion on July 23, 2008.

---

[1]In addition to the National Renal Alliance, LLC, Plaintiffs include: NRA-Augusta, Georgia, LLC, d/b/a South Augusta Dialysis Center; NRA-Eatonton, Georgia, LLC, d/b/a Putnam Dialysis Center; NRA-Gray, Georgia, LLC, d/b/a Gray Dialysis Center; NRA-Hogansville, Georgia, LLC, d/b/a Hogansville Dialysis Clinic; NRA-Macon, Georgia, LLC, d/b/a Eisenhower Parkway Dialysis Center; NRA-Midtown Macon, Georgia, LLC, d/b/a Midtown Macon Dialysis Center; NRA Milledgeville, Georgia, LLC, d/b/a Oconee Dialysis Center; NRA-Newnan Acquisition, LLC, d/b/a Newnan Dialysis Services; NRA-North Augusta, South Carolina, LLC, d/b/a River View Kidney Center; NRA-Monticello, Georgia, LLC, d/b/a Monticello Dialysis Center; NRA-Palmetto, Georgia, LLC, d/b/a Palmetto Dialysis Clinic; NRA-Valdosta, Georgia, LLC, d/b/a Valdosta Dialysis Clinic. For the sake of clarity, the court refers to Plaintiffs collectively as National Renal.

[2]The complaint also names as Defendant "any health plan, including but not limited to self-insured health plans, administered by Blue Cross & Blue Shield of Georgia, Inc., who insures one or more individuals receiving dialysis services from Plaintiff from January 1, 2007 to the present."

"Since 2002, National Renal Alliance, LLC has been in business as the majority owner and manager of local dialysis centers which provide dialysis services to Georgia citizens living in small towns and rural areas." First Amended Complaint, ¶ 18. Many of the patients who use National Renal Alliance's facilities have End Stage Renal Disease. *Id.*, ¶ 19.

Blue Cross is the largest healthcare coverage provider in the state of Georgia with more than 3.3 million members. *Id.*, ¶ 25. Blue Cross offers Preferred Provider Organization ("PPO") plans. *Id.*, ¶ 26. In PPO plans, enrollees elect to pay a higher premium in exchange for flexibility to receive services from providers not in Blue Cross's preferred network, that is, "out-of-network" care. *Id.* Blue Cross also offers Point of Service ("POS") plans whereby enrollees who use in-network care pay no deductible and a minimum co-payment, while if they go outside the network, the POS plan operates like a PPO plan. *Id.*, ¶ 27. POS and PPO plans cost more than Health Maintenance Organization ("HMO") plans because of the costs of out-of-network care. *Id.*, ¶ 28.

National Renal is not in Blue Cross's preferred network and thus nearly all of National Renal's Blue Cross patients are enrolled in PPO or POS plans. *Id.*, ¶ 29. Since January 2007, National Renal has provided dialysis services on an out-of-network basis to twenty-four patients under Blue Cross PPO or POS plans. *Id.* "On information and belief, one or more of these plans are 'employee welfare benefit plans' as defined by section

3

1002(1) of ERISA." *Id.* For most of its Blue Cross patients, National Renal submits to Blue Cross (on behalf of the patients) claims for reimbursement of the dialysis services. *Id.*, ¶ 31. National Renal is then reimbursed by Blue Cross. *Id.* (noting that most patients have signed "Assignment of Benefits" forms for National Renal).

Dialysis treatments typically last three to five hours and should be given three times per week, or approximately 156 times per year. *Id.*, ¶ 32. Medicare began covering dialysis treatments in 1972. *Id.*, ¶ 34. Congress passed legislation "providing that End Stage Renal Disease patients who are enrolled in group health plans . . . have the right to choose to remain in the plan for an additional 30 months before they must enter the Medicare program (or upon reaching the age of 65, whichever is earlier)." *Id.* The "30 month coordination period" begins after a three-month "waiting" or "qualification" period before Medicare coverage begins. *Id.*, ¶ 35. During the coordination period, the group health plan pays as the primary insurer and Medicare functions as the secondary payer. *Id.* After the coordination period, Medicare becomes the primary payer. *Id.* It is possible for patients to drop out of private coverage (and go with Medicare) during the coordination period, but many do not do so because they want better services and want to coordinate their care with spouses and children. *Id.*, ¶ 36.

Congress enacted the "Anti-Discrimination" provisions of the Medicare as Secondary Payer Statute, 42 U.S.C. § 1395y(b)(1)(C), which prohibit a health plan from "tak[ing] into

4

account" that an individual covered by virtue of "current employee status" is entitled to receive Medicare benefits as a result of age, disability, or End Stage Renal Disease. *Id.*, ¶ 37. A health plan also may not "differentiate in the benefits it provides between individuals who have ESRD and others enrolled in the plan, on the basis of the existence of ESRD, or the need for renal dialysis, or in any other manner." 42 U.S.C. § 1395y(b)(1)(C)(i)-(ii). *Id.* The accompanying regulations define "taking into account" to be if a plan "terminate[s] coverage of individuals with ESRD, when there is no basis for such termination unrelated to ESRD"; "impos[es] on persons who have ESRD, but not on others enrolled in the plan, benefit limitations such as less comprehensive health plan coverage, reduction in benefits, exclusion of benefits, a higher deductible or coinsurance"; "pay[s] providers and suppliers less for services furnished to a Medicare beneficiary than for the same services furnished to an enrollee who is not entitled to Medicare"; or "provide[s] misleading or incomplete information that would have the effect of inducing a Medicare entitled individual to reject the employer plan, thereby making Medicare the primary payer." 42 C.F.R. § 411.161(b)(2)(i)-(ii); 42 C.F.R. § 411.108(a)(8)-(9). *Id.*, ¶ 38.

Georgia also has a state statute which governs the operation of PPOs, O.C.G.A. §§ 33-30-20, *et seq.. Id.*, ¶ 39. The statute prohibits provider arrangements which "unfairly deny health benefits for medically necessary covered services" or "[h]ave an adverse effect on the availability or quality of services." *Id.*, ¶ 40 (citing O.C.G.A. § 33-30-23(b)(1), (5)).

5

The statute also bars certain variations in reimbursement between preferred and out-of-network services. *Id.* (citing O.C.G.A. § 33-30-23(3), (4)).

Because of the special provisions for individuals with End Stage Renal Disease, approximately seventy-five to eighty percent of the dialysis patients in the nation are covered by Medicare. *Id.*, ¶ 42. "Medicare reimburses for dialysis treatment at a rate lower than the average cost of providing the actual service in most settings. Thus, providers like National Renal depend entirely on revenue from treating patients who are still covered through commercial insurance to sustain their business and keep their doors open for patients." *Id.* Because National Renal is focused on providing dialysis in small, underserved areas, it cannot rely on the economies of scale that dialysis centers in larger areas can. *Id.* "National Renal depends on the commercial payor reimbursements for the 10% of its patients who are not yet receiving primary coverage from Medicare." *Id.*

In January 2007, Blue Cross cut its reimbursement for out-of-network dialysis to levels below the customary charges associated with such care. *Id.*, ¶ 45. In 2006, Blue Cross had determined that the "usual, customary, and reasonable" charge for National Renal's dialysis services was $2,900 per treatment which was similar to the rate at which other commercial payors reimbursed National Renal. *Id.* The January 2007 reimbursement level dropped by eighty-eight percent. *Id.* National Renal contends this is a manipulation of reimbursement rates designed to target out-of-network providers. *Id.*

6

National Renal contends that the reduction in the "usual, customary and reasonable" reimbursement violates the Anti-Discrimination provisions of the Medicare as Secondary Payer Act because it takes into account an End Stage Renal Disease patient's Medicare-eligible status. *Id.*, ¶ 46. The rate cut singled out End Stage Renal Disease patients and not other services. *Id.*, ¶ 47. "Blue Cross's actions disrupt the delicate balance that the government anticipated when it drafted laws specific to End Stage Renal Disease requiring group health plans to act as primary payor initially but relieving them of all reimbursement obligations after a mere 30 months." *Id.*, ¶ 48.

Blue Cross's statement in a letter to enrollees that they will "be unaffected' by the reduction in reimbursement is false because enrollees' costs for out-of-network dialysis care during the three-month "waiting period" will increase. *Id.*, ¶ 49. Because National Renal cannot provide services at the lower reimbursement rate, it will eventually be forced to drop Blue Cross enrollees. *Id.*

National Renal also contends that by reducing the reimbursement rates, Blue Cross is effectively denying its members the bargained-for out-of-network benefits of the PPO and POS plans in violation of Georgia's PPO statute. *Id.*, ¶ 50. The cap on reimbursement will have an adverse effect on the availability and quality of services to patients in rural communities, which also violates Georgia's PPO statute. *Id.*, ¶ 51.

AO 72A
(Rev.8/82)

Blue Cross did not assure that its enrollees or National Renal were apprised of the situation. *Id.*, ¶ 52. Because of the ninety-day billing delay cycle, National Renal did not learn of the reduction in reimbursement for several months. *Id.* National Renal billing personnel contacted Blue Cross several times in April or May of 2007 to learn why the reimbursement rate had dropped and received numerous varying explanations. *Id.* Blue Cross told National Renal in August 2007 that the reimbursement discrepancies were due to lowered reimbursement rates which had gone into effect in January 2007. *Id.*, ¶ 53. "Upon information and belief" National Renal's patients had not been informed of the change. *Id.*

In August 2007, Blue Cross faxed a copy of a December 12, 2006 notice that had been sent to all out-of-network dialysis providers. *Id.*, ¶ 54. The notice stated that its purpose was to "advise [out-of-network providers] of an upcoming change" in reimbursement rates and that Blue Cross "will update its maximum allowable rates" for such providers. *Id.* The notice did not specify an eighty-eight percent cut in reimbursement rates for dialysis treatments. *Id.* On October 11, 2007, Blue Cross informed National Renal via e-mail that the new reimbursement rate would be $350. *Id.*

National Renal's Chief Executive Officer, Joe Cashia, sent a letter to Colin Drozdowski, Blue Cross Vice President of Health Services, on September 14, 2007, outlining the dire consequences of the rate cut. *Id.*, ¶ 56. On October 24, 2007, Blue Cross

8

Director of Provider Network Management, Kathryn Norman, and Director of Provider Contracting, Valerie Ringo, met with Mr. Cashia in Richmond, Virginia, where Mr. Cashia explained that reimbursement cuts like this would eventually force dialysis providers out of business. *Id.*, ¶ 57. At this meeting, Ms. Norman showed Mr. Cashia a copy of the letter Blue Cross had sent to its enrollees, but this letter did not inform enrollees that the reimbursement would be cut by eighty-eight percent and the enrollees might have personal liability for some charges. *Id.*, ¶ 60. The notice stated that the change in policy "may" result in higher co-pays for patients. *Id.* Blue Cross's rate reduction will ultimately deny PPO and POS plan enrollees the ability to choose an out-of-network provider for dialysis care. *Id.*, ¶ 61.

Under their claim for ERISA benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiffs assert that "National Renal is the assignee of health care benefits payments provided to Blue Cross's PPO and POS members enrolled in ERISA plans who have signed assignment-of-benefit forms assigning their right to payment for dialysis services to National Renal." *Id.*, ¶ 67. National Renal believes the terms of those plans are that Blue Cross will offer coverage for out-of-network services and when Blue Cross fails to do so, it violates the terms of the plans. *Id.*, ¶ 68. Blue Cross has failed to indemnify National Renal as assignee of its PPO and POS enrollees' benefits by paying only twelve percent of the customary

9

charges and has also nullified the "Out-of-Pocket Maximum" financial liability Blue Cross promised to its members when they enrolled in the plans. *Id.*, ¶ 69.

For those patients who are not enrolled in ERISA-covered plans, National Renal asserts a breach of contract claim in its position as assignee of health care benefits for these individuals. National Renal further alleges that Blue Cross has breached its agreement with these individuals by failing to offer coverage for out-of-network services. *Id.*, ¶ 73. National Renal asserts similar claims in its position as assignee for any ERISA enrollees or non-ERISA enrollees who have not specifically provided a written assignment of benefits form. *Id.*, ¶ 74. Blue Cross has failed to indemnify National Renal as assignee of these individuals by paying only twelve percent of customary charges and by effectively nullifying the "Out-of-Pocket Maximum." *Id.*, ¶ 76. National Renal brings these same breach of contract claims in its capacity as a third-party beneficiary with respect to Defendant's non-ERISA patients. *Id.*, ¶¶ 79-82.

In its misrepresentation claim, National Renal alleges that Blue Cross willfully and intentionally deceived National Renal regarding the material facts of its reimbursement rates for dialysis services so that National Renal would continue to provide those services to Blue Cross enrollees. *Id.*, ¶ 84. This misrepresentation occurred through misleading letters sent to National Renal clinics and patients failing to notify them of drastic rate cuts. *Id.* National Renal also alleges that Blue Cross personnel gave inaccurate explanations of its billing to

10

National Renal personnel in late spring 2007 through October 2007. *Id.* Plaintiffs allege this was done to induce National Renal to continue to accept and treat Blue Cross patients. *Id.*, ¶ 85. National Renal also contends that it relied on Blue Cross's marketing of its plans as PPO and/or POS plans which have "customary meaning in the market as providing coverage for the usual and customary reimbursement of out-of network care, and on the parties' past course of dealing." *Id.*, ¶ 87. National Renal also performed in expectation that Blue Cross was acting in compliance with Georgia's PPO statute. *Id.*

Plaintiffs raise an Unfair and Deceptive Trade Practices Act claim asserting that Blue Cross's conduct in continuing to market its PPO plans as providing patients with a choice of out-of-network providers in exchange for higher premiums at the same time as lowering the reimbursement rates for out-of-network providers is a deceptive or potentially confusing trade practice. *Id.*, ¶ 90. Blue Cross's actions confuse National Renal patients concerning out-of-network care, but also through the "inadequate and unassuming" letters concerning the changes in reimbursement rates. *Id.*, ¶ 91. Defendant's actions violate Georgia's PPO statute, O.C.G.A. § 33-30-23(a)(2), because payments at twelve cents on the dollar are neither fair nor reasonable as required by the statute. *Id.*, ¶ 93. The reimbursement rate also violates Georgia's statute because it causes differences in coinsurance percentages between preferred and nonpreferred providers. *Id.*, ¶ 95.

AO 72A
(Rev.8/82)

Under quantum meruit, National Renal contends that it has performed valuable dialysis services the benefit of which Blue Cross has accepted in the form of insurance premiums paid by its enrollees in exchange for these services, but Blue Cross has failed to compensate National Renal for these services.  *Id.*, ¶¶ 104-05.  In their unjust enrichment claim, Plaintiffs allege Defendant has deprived them of the customary value of their services as well as unfairly benefitted from retaining higher premiums from its PPO and POS members in exchange for reimbursement of these more costly out-of-network services.  *Id.*, ¶¶ 109-10.  Plaintiffs seek expenses of litigation in conjunction with their unfair trade practices and ERISA claims.

**B.    Contentions**

Defendant contends that Plaintiffs do not have standing to bring a Medicare as Secondary Payer Act claim; Plaintiffs' complaint does not state a claim for violation of the Medicare Secondary Payer Act as Blue Cross has no "demonstrated responsibility" to pay for Plaintiffs' billed charges, and Plaintiffs have not alleged any financial harm to Medicare. That is, Defendant argues that Plaintiffs' Medicare as Secondary Payer Act claim implicates only Plaintiffs' commercial interest and not Medicare's fiscal integrity.  Defendant further contends that the Medicare as Secondary Payer Act does not cover situations where there is a difference in payment to providers for dialysis services and "other" services, but rather

12

the regulations prohibit differentiation between payment to providers for services furnished to a Medicare beneficiary and for "the same services" furnished to a non-Medicare enrollee.

Plaintiffs respond that Defendant's decision to cut reimbursement rates for dialysis treatment does affect Medicare's fisc because more patients will opt to leave private insurance before the end of the coordination period and move to Medicare. Plaintiffs contend that Defendant's "demonstrated responsibility" to pay exists in the terms of the health insurance plans it issues. Finally, Plaintiffs argue that Defendant's reduction in reimbursement violates the anti-discrimination provisions of the Medicare as a Secondary Payer statute.[3]

## II.  Analysis

### A.  Medicare as Secondary Payer Act

The Medicare system federally funds healthcare for three categories of individuals: (1) aged, (2) disabled, and (3) those with end stage renal disease (ESRD). *See generally Health Insurance Association of America, Inc. v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994) (describing background of Medicare). Many of those individuals covered by Medicare are also eligible for privately-funded health care insurance through group health care plans

---

[3]This court's Local Rules do not provide for the submission of a surreply. *See generally* LR 7 & 7.1C, N.D. Ga. The circumstances under which a surreply provides additional relevant information to the court are rare. The court finds the proposed surreply here does not add to substantive pleadings. The legal "mischaracterizations" alleged by Plaintiffs are simply re-argument. Therefore, the court DENIES Plaintiffs' motion for leave to file surreply [17].

13

offered by employers. For fifteen years, Medicare paid for services provided to individuals regardless of whether they were also covered by group health care plans. In 1981, however, Congress amended the Medicare statute so that Medicare would become a "secondary" payer for those individuals who were also covered by group health insurance. Those amendments were codified at 42 U.S.C. § 1395y(b), and are referred to as the Medicare as Secondary Payer Act.

Of particular interest to the parties here, Medicare as a Secondary Payer Act contains "non-discrimination" provisions directing that a group health plan "may not take into account" or "may not differentiate in the benefits it provides" to individuals with ESRD and those without ESRD. *See* 42 U.S.C. § 1395y(b)(1)(C). The regulations implementing the non-discrimination portions of the statute prohibit a Group Health Plan from taking into account Medicare eligibility or entitlement or differentiating benefits. *See* 42 C.F.R. § 411.161. The regulations particularly relevant here explain that "taking into account" could mean:

> (ii)     Imposing on persons who have ESRD, but not on others enrolled in the plan, benefit limitations such as less comprehensive health plan coverage, reductions in benefits, exclusion of benefits, a higher deductible or coinsurance, a longer waiting period, a lower annual or life-time benefit limit, or more restrictive preexisting illness limitations.
>
> . . . .
>
> (iv)     Paying providers and suppliers less for services furnished to individuals who have ESRD than for the same services furnished to those who do not have ESRD, such as paying 80 percent of the

Medicare rate for renal dialysis on behalf of a plan enrollee who has ESRD and the usual, reasonable and customary charge for renal dialysis on behalf of an enrollee who does not have ESRD.

*Id.* § 411.161(b)(ii) & (iv).[4]

The statute also provides for "conditional" payments by Medicare. This allows Medicare to pay for services received by individuals covered by group health care plans but conditions the payment of those services on reimbursement to Medicare by the group health care plan. 42 U.S.C. § 1395y(b)(2)(A) & (B). In the event that Medicare would need to take action to recover these "conditional" payments, the statute allows the United States to bring an action against any entity responsible for making those payments. *Id.*, § 1395y(b)(2)(B)(ii).

The Medicare as Secondary Payer Act also allows for a private right of action if an employer group health plan fails to make appropriate primary payments for services. The private right of action provision states: "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case

---

[4]42 C.F.R. § 411.108(a)(5) suggests as an example of "taking into account" that a group health care plan may not

> impos[e] limitations on benefits for a Medicare entitled individual that do not apply to others enrolled in the plan, such as providing less comprehensive health care coverage, excluding benefits, reducing benefits, charging higher deductibles or coinsurance, providing for lower annual or lifetime benefit limits, or more restrictive pre-existing illness limitations.

*Id.* The court finds this language substantially similar to 42 C.F.R. § 411.161(b)(ii) and should be analyzed in the same manner.

15

of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3).

Although no court has specifically addressed the instant issue, numerous courts have considered the interaction of Medicare as a Secondary Payer Act with group health care plans in a variety of contexts, and a review of those cases provides helpful background.

For example, the Eleventh Circuit considered the Secondary Payer Act in conjunction with a disagreement between two private group health insurance plans as to who had the primary responsibility for payment of services. *See Harris Corporation v. Humana Health Insurance Co.*, 253 F.3d 598 (11th Cir. 2001) (per curiam). One health care plan covered the insured under her spouse's health care coverage, and the other plan covered the insured under her own employment. Both plans contained a coordination of benefits provision, although they varied in detail. On appeal, the insurance company did not contest the district court's reading of the coordination of benefits provisions, but rather argued that the Medicare as a Secondary Payer Act altered the priority of payment established by those provisions.

In considering that argument, the Eleventh Circuit relied on two Sixth Circuit cases: *Baptist Memorial Hospital v. Pan American Life Insurance Company*, 45 F.3d 992 (6th Cir. 1995), and *Perry v. United Food & Commercial Workers District Unions*, 64 F.3d 238 (6th Cir. 1995). In *Baptist Memorial*, the Sixth Circuit reviewed a dispute between two private

16

insurance companies where Medicare was not involved and concluded that Medicare as a Secondary Payer Act did not apply. Specifically, the court stated:

> The sole interest of Congress, as far as the statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations. Where that interest is not affected – and it does not seem to be here – we see no reason why the pertinent contractual provisions should not be enforced in accordance with their terms.

*Id.* at 996 and 998. Relying on *Baptist Memorial* in *Perry*, the Sixth Circuit held that the Medicare as a Secondary Payer Act did not affect "contractual regulations" between two insurance companies and "where the fiscal integrity of the Medicare program was not jeopardized, the MSP statute had no application to the obligation of the wife's employer's insurer to pay the hospital bill at issue." *Harris*, 253 F.3d at 604 (citing *Perry*).

In affirming the decision of the district court, the Eleventh Circuit in *Harris* fully adopted the reasoning and holdings of the two Sixth Circuit cases. "Where Medicare's liability to pay health care expenses is not at issue, it follows that the statute would not operate to rearrange the priority of payment as between purely private insurance plans." *Id.* at 605. Notably, the court went on to elaborate that it rejected appellant's argument that the Medicare as a Secondary Payer Act was not premised on the idea of Medicare's "fiscal integrity." Rather, the court noted that the

> plain language of the statutory provision creating the private cause of action does expressly state that the cause of action exists when a plan fails to provide for primary payment 'in accordance' with the Medicare as Secondary Payer provisions. Because *those* provisions dictate only the liability of private

17

insurance plans *relative to the Medicare program*, it appears completely
consistent with the plain language of the provision creating the private cause
of action that such a cause of action exists only where a plan has failed
properly to provide for its liability vis-a-vis Medicare. In all such cases, the
fiscal integrity of the Medicare program that the MSP statute was designed to
protect, would be at issue. Thus, the finding of the district court and the Sixth
Circuit that the fiscal integrity of the Medicare program must be in jeopardy
in order for the private cause of action to exist is not contrary to the plain
language of the statute.

*Id.* at 605 n.5 (emphasis in original).

Other courts have noted that there is no legislative history of the private right of

action provision which was added to the legislation in 1986. *See, e.g.*, *Stalley ex rel. v.*

*Catholic Health Initiatives*, 509 F.3d 517, 524 (8th Cir. 2007). "Courts considering the

provision have generally agreed that the apparent purpose of the statute is to help the

government recover conditional payments from insurers or other primary payers." *Id.*

(citing cases). *See also Frazer v. CNA Insurance Company*, 374 F. Supp. 2d 1067, 1078

(N.D. Ala. 2005) (Clemon, J.) (noting that "all reported cases addressing the question have

presumed that such a cause of action and the relief afforded by the statute arises only when

a discrete claim has accrued and will be paid or has been paid by Medicare. The consensus

of reported cases is [] 'a private cause of action and double damages against entities

designated as primary payers that fail to pay for medical costs for which they are

responsible, *which are borne in fact by Medicare*') (emphasis in original) (quotation and

citation omitted)); *Manning v. Utilities Mutual Insurance Co.*, 2004 WL 235256 (S.D.N.Y.

18

2004) (recognizing right of private citizen to bring action where there is evidence of specific medical treatment which has been paid by Medicare), *aff'd*, 254 F.3d 387 (2d Cir. 2001).

Considering, then, the context of the Medicare as a Secondary Payer Act, the court finds that Plaintiffs have not demonstrated that Blue Cross's decision to lower reimbursement rates on dialysis treatment received at out-of-network facilities constitutes "taking into account" or "differentiating" a level of coverage provided to those suffering from ESRD and those not. Blue Cross's actions do not run afoul of the implementing regulations because they provide the same level of reimbursement for out-of-network dialysis treatment regardless of the insured's reason for receiving the treatment. The fact that Blue Cross has determined that it will pay a lower rate of reimbursement for dialysis treatments received at out-of-network facilities does not alter the benefits granted to a Medicare enrollee as opposed to a non-Medicare enrollee. Further, the court finds that Plaintiffs have not established that a health plan's decision to lower reimbursement rates to its members for services received at an out-of-network facility impacts the Medicare as a Secondary Payer Act.[5]

_____

[5]Nor have Plaintiffs alleged that Blue Cross has a "demonstrated responsibility" to pay greater than Blue Cross's reimbursement to Plaintiffs. Under Medicare as a Secondary Payer Act, the group health plan's responsibility to make a reimbursement is established by "a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) [i.e., a settlement], or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii); *see also Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1309 (11th Cir. 2006) (per curiam). Plaintiffs assert they are positing a different type of claim because they are not seeking to enforce a primary plan's obligation to

19

Significant to the court's finding is the fact that there is no allegation that Blue Cross pays a different amount for dialysis treatment of non-ESRD patients than ESRD patients. Blue Cross has designated one amount for dialysis treatment. In the end, the court finds that this is a dispute between National Renal Alliance and Blue Cross involving in-network and out-of-network service providers.[6] The person getting the benefit of the dialysis can still get that service and can still get that service at a higher reimbursement rate by using an in-network service provider. Plaintiffs squarely state in their complaint that they use the higher reimbursement rates of privately insured customers to offset the lower reimbursement of Medicare so that they can provide dialysis services to customers in rural and underserved areas. Whatever the net positive effect of that is for health care consumers in general, the

---

reimburse Medicare. Even if they were, Plaintiffs continue, Blue Cross's obligation to pay for out-of-network expenses is established by the insureds' group health plans. For the purposes of the "demonstrated responsibility" to pay requirement, however, the court sees no reason to distinguish between a claim seeking reimbursement and a claim alleging that the insurer failed to pay claims.

[6]Plaintiffs' own arguments reveal this basis for Plaintiffs' complaint. For example, Plaintiffs argue:

> Blue Cross cannot take shelter under 42 C.F.R. § 411.161(c), which states that a plan "is not prohibited from limiting covered utilization of a particular service as long as the limitation applies uniformly to all plan enrollees." Blue Cross is not merely imposing a uniform limit on "utilization of a particular service." Rather it has enacted rate cuts *intended largely or altogether to curtail utilization of out-of-network dialysis services.*

*See* Plaintiffs' Response, at 13-14 (emphasis added). Medicare as a Secondary Payer Act is not directed at the different reimbursement rates for in-network and out-of-network providers. Rather, it prohibits against discrimination in insurance coverage provided to those with ESRD.

AO 72A
(Rev.8/82)

Medicare as a Secondary Payer Act was not intended to address such a situation and was not intended to force insurance companies to subsidize dialysis treatment so that individuals in "underserved" areas could obtain treatment.

To the extent Plaintiffs argue that the lower reimbursement rate set by Blue Cross will cause more ESRD patients to cancel their private insurance and switch to Medicare as the primary payer, thereby increasing Medicare's costs, the court notes that Blue Cross's new reimbursement rate is still above that provided by Medicare. Further, Plaintiffs' proposed theory of damages is the difference between the cost of the service and the rate of payment set by the provider. This calculation, however, has no impact on Medicare. The damages provided for in the statute simply do not fit the situation here. Congress could not have intended for a service provider to receive double recovery when half of the recovery is supposed to go to Medicare.[7] For the foregoing reasons, the court finds that Plaintiffs' Medicare as a Secondary Payer Act cause of action fails to state a claim for which relief can be granted.

### B.      ERISA Exhaustion

Defendant contends that Plaintiffs failed to plead exhaustion of administrative remedies with respect to their ERISA claims. Plaintiffs respond that they did go through a

---

[7]Defendant has couched its argument both in terms of Plaintiffs' standing, as well as whether Plaintiffs' claim fits under the rubric of the Medicare as a Secondary Payer Act. Because the court finds that Plaintiffs' claim is not covered by the Act, the court need not directly address Defendant's standing argument.

AO 72A
(Rev.8/82)

grievance process by relating their complaints to the highest levels of Defendant's company. Even if they did not satisfy a particular administrative grievance process, Plaintiffs argue that exhaustion should be excused for futility and inadequacy.

As a general rule, ERISA plaintiffs are required to exhaust all available administrative remedies before they file an action in federal court. *See*, *e.g.*, *Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000); *Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042 (11th Cir. 1995). There are exceptions to this rule when "resort to administrative remedies would be futile or the remedy inadequate, or where a claimant is denied meaningful access to the administrative review scheme in place." *Perrino*, 209 F.3d at 1315-16. The exceptions are narrowly construed and should be used only when "requiring a plaintiff to exhaust an administrative scheme would be an empty exercise in legal formalism." *Id.* at 1318. *See also Lanfear v. Home Depot, Inc.*, 536 F.3d 1217 (11th Cir. 2008) (noting that "futility exception protects participants who are denied meaningful access to administrative procedures, not those whose claims would be heard by an interested party"); *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006) (per curiam) (rejecting futility argument as speculative because participant had not even attempted to pursue administrative remedies). ERISA plaintiffs are required to plead exhaustion in their complaint. *See*, *e.g.*, *Byrd v. MacPapers, Inc.*, 961 F.2d 157 (11th Cir. 1992) (affirming dismissal of plaintiff's claims where she "failed to plead

AO 72A
(Rev.8/82)

exhaustion of administrative remedies or impossibility. Plaintiff did not allege anything about whether she pursued any available relief under the claims procedures terms of MacPapers' employee benefits plan.").

Here, Plaintiffs challenge not a refusal to pay claims related to a single patient. Rather, they challenge a policy of Defendant in implementing its health insurance. Plaintiffs alleged in their complaint that they contacted Blue Cross personnel to inquire as to the rate change. National Renal's executives then began a correspondence with Blue Cross executives, including the Vice President of Health Services. Blue Cross representatives even met with National Renal executives. While Plaintiffs may not have followed a formal exhaustion process, it is clear that Blue Cross has had an opportunity to understand National Renal's grievance and consider any response it might want to make. Under these circumstances, the court finds that to require National Renal to go back now and engage in the exhaustion process set forth in the policy would be an "empty exercise in legal formalism" and would not further the purposes of the exhaustion requirement. *See Perrino*, 209 F.3d at 1315 ("administrative claim-resolution procedures reduce the number of frivolous lawsuits under ERISA, minimize the cost of dispute resolution, enhance the plan's trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decisionmaking process, and allow prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually

litigated"). Therefore, the court will not dismiss Plaintiffs' claims for failure to exhaust administrative remedies.

## C. ERISA Preemption

Plaintiffs' complaint contains state law causes of action for breach of contract, misrepresentation in marketing its plans to patients and the extent of coverage for out-of-network dialysis services, unjust enrichment, quantum meruit, and violations of Georgia's Uniform Deceptive Trade Practices Act.

Defendant argues that Plaintiffs' breach of contract claims and equitable contract claims are preempted because they "relate to" reimbursement for services Plaintiffs allege were provided to patients covered by ERISA plans. Defendant further alleges that Plaintiffs' misrepresentation claim is also preempted because it is based upon the failure of a plan to pay benefits.

Plaintiffs respond that as health care providers they were not parties to the ERISA bargain and therefore their claims should not be impacted by ERISA. Plaintiffs note that some portion of their patients are not enrolled in ERISA plans, and therefore claims related to those patients cannot be preempted. Finally, Plaintiffs assert that their Unfair and Deceptive Trade Practice Act claim arises from the fact that Blue Cross sent misleading notices to National Renal and violated Georgia's PPO statute. Because these claims arise out of the relationship between National Renal and Blue Cross and do not relate to the

ERISA plans, Plaintiffs argue they are not preempted. Similarly, the misrepresentations alleged by Plaintiffs involve the letters sent by Blue Cross to National Renal and its patients, as well as misleading information given by Blue Cross to National Renal billing personnel and Blue Cross's failure to act in conformity with the customary meaning of a PPO or POS plan and therefore are not preempted by ERISA.

In ERISA jurisprudence, the court must distinguish between jurisdictional preemption, which is known as complete or super-preemption, and defensive preemption which a defendant may raise as an affirmative defense. *See Ervast v. Flexible Products Co.*, 346 F.3d 1007, 1012 (11th Cir. 2003). If a state law claim is subject to defensive preemption, whether it is brought in state or federal court, "the defendant may raise the defense that the claims are preempted by ERISA under § 1144, and should be dismissed. Super- preemption, on the other hand, recharacterizes the state law claim into a federal claim under § 1132, so long as the other three *Butero* elements are present." *See id.*[8]

---

[8]Section 1132(a)(1)(B) allows suit by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." If a court determines that a plaintiff's state law claim is seeking this type of relief, the suit can be removed on the basis of federal jurisdiction. *See Ervast*, 346 F.3d at 1014. The Eleventh Circuit set forth its four-part test for determining the jurisdictional issue of super-preemption under ERISA in *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207 (11th Cir. 1999). The court must consider whether: (1) a relevant ERISA plan exists, under which a (2) plaintiff with standing is suing (3) an ERISA entity for (4) compensatory relief akin to that available under § 1132(a) - often a claim for benefits due under a plan. *Id.* at 1212; *see also Jones v. LMR International, Inc.*, 457 F.3d 1174, 1178 (11th Cir. 2006).

25

Defensive preemption, at issue here, applies through 28 U.S.C. § 1144(a), which states: "Except as provided in subsection (b) of this section, the provisions of this subchapter . . . shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan." *Id.* The ERISA preemption statute does not define "relates to," but the Supreme Court has explained that a state law relates to an employee benefit plan "if it has a connection with or reference to such a plan." *New York Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995).

In a long line of cases, the Eleventh Circuit has applied the "relates to" phrase in a variety of circumstances. In *Morstein v. National Insurance Services, Inc.*, 93 F.3d 715 (11th Cir. 1996) (en banc), the president and sole shareholder of a corporation filed suit in state court alleging negligence, malfeasance, misrepresentations, and breach of contract arising out of her purchase of a medical insurance policy for herself and the corporation's only other employee. The plaintiff purchased the policy from an insurance broker, and the policy was to be administered by one insurance company and underwritten by another insurance company. The plaintiff conveyed to the broker that any policy would be unacceptable if it excluded from coverage medical treatment related to any preexisting condition, and the broker assured her that the policy would meet her specifications. The plaintiff subsequently underwent surgery, and the insurance company administering the policy refused payment on the grounds that the surgery treated a preexisting condition. After removal of the case

26

to federal court, the district court found that the plaintiff's claims were preempted by ERISA and granted summary judgment to the broker and his agency, the administrator, and the underwriter. *Id.* at 716-17.

The en banc appeals court reversed as to the claims against the broker and his agency, concluding that such claims were not related to a benefit plan within the scope of ERISA. In doing so, the court expressly noted that the plaintiff "is a plan beneficiary who is bringing suit against the insurance agency and agent, who she alleges fraudulently induced her to change benefit plans." *Id.* at 722. The court further noted that neither the broker nor his agency were ERISA entities, which it identified as "the employer, the plan, the plan fiduciaries, and the beneficiaries under the plan." *Id.* The court contrasted the case before it with *Variety Children's Hospital, Inc. v. Century Medical Health Plan, Inc.*, 57 F.3d 1040 (11th Cir. 1995), which found ERISA preemption with regard to state law claims of fraud and misrepresentation concerning coverage brought by the assignee of the plan beneficiary against the plan itself. The *Morstein* court noted that the claims in *Variety* "involved ERISA entities . . . and the state law claims were based on an interpretation of the plan." *Id.* at 723; *see also Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186 (11th Cir. 1997) (state law claims "relate to" ERISA plans when "the alleged conduct at issue is intertwined with the refusal to pay benefits").

AO 72A
(Rev.8/82)

In *Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024 (11th Cir. 1997), the plaintiff left her job with one employer to take a position with another employer. The new employer assured the plaintiff that her husband, as beneficiary under her medical plan, would receive the same level of care as with her previous employer, which provided for twenty-four-hour home nursing care. After taking the position with the new employer, the plaintiff received notification that the new employer had been purchased by another company, and the new company's plan would not provide benefits for private home nursing care. The plaintiff filed suit, alleging that she was fraudulently induced to leave her previous employment as a result of the misrepresentations regarding home nursing care. The district court found that the plaintiff's claims were preempted by ERISA and granted summary judgment to the defendant. *Id.* at 1026-27. On appeal, the Eleventh Circuit affirmed. In doing so, it declined an invitation to extend *Morstein* to the facts of the case before it. The court contrasted *Morstein* by pointing out that, in the present case, both the plaintiff and the defendant were ERISA entities at the time the representations were made. Additionally, the plaintiff's claims about coverage would require a comparison of the benefits provided by her previous employer with those provided by her new employer. Thus, her "state law claims ha[d] a direct connection to the administration of medical benefits under an ERISA plan." *Id.* at 1029.

In *Engelhardt v. Paul Revere Life Insurance Co.*, 139 F.3d 1346 (11th Cir. 1998), the Eleventh Circuit again determined that plaintiff's state law claims based on misrepresentations as to the scope of coverage under a benefits plan were preempted by ERISA. In reaching this conclusion, the court noted that Paul Revere, the insurance company, had "assumed its role as an ERISA entity and [employer's] ERISA plan had been established before, albeit only shortly before, Paul Revere made its alleged misrepresentations to [plaintiff] regarding the scope of coverage under the ERISA plan." *Id.* at 1352-53.

Finally, in *Jones v. LMR International, Inc.*, 457 F.3d 1174, 1178 (11th Cir. 2006), the plaintiffs were employees of a company, LMR, that offered a health plan administered by Defendant Great West Life & Annuity Insurance Company. The plaintiffs claimed that although LMR had deducted funds from their paychecks for the health benefit plan, LMR had neglected to remit those funds to Great West. As a result, Great West terminated its health plan with LMR, but neither LMR nor Great West informed plaintiffs that coverage had ended. The plaintiffs raised state law claims of fraud, suppression, breach of contract, civil theft, unjust enrichment, negligence, and wantonness, and defendants removed the suits to federal court arguing the state law claims were completely preempted by ERISA. The plaintiffs amended their complaint to add an ERISA claim and the district court dismissed the state law claims as having been defensively preempted by ERISA.

After considering the complete preemption question, the court turned to defensive preemption of claims against a non-fiduciary plan administrator. The court stated that whether a claim relates to a plan and is therefore preempted by ERISA is a "question of congressional intent." *Id.* at 1179. The court further noted that the "sweep of ERISA preemption is broad, applying well beyond those subjects covered by ERISA itself" and can include an agent of an entity administering a plan. *Id.* at 1179-80. The court further concluded that the claims against Great West, a non-ERISA entity insurance company, for fraudulently inducing a plaintiff to change benefit plans would be preempted because those state law claims "affect relations among principal ERISA entities." *Id.* at 1180 (distinguishing *Morstein* because the plaintiffs here had admitted that Great West was at one point an ERISA fiduciary). Even if Great West had not been an ERISA entity, however, the court found that the plaintiffs' claims would be preempted because they affected relations among ERISA entities. The court found that plaintiff's "claims against Great West for, among other things, failing to disclose that the ERISA plan had lapsed, would likewise upset the uniform regulation of plan benefits contrary to Congress's intent." *Id.* at 1180.

Drawing on these precedents, the court turns to Plaintiffs' state law claims here. Plaintiffs' complaint is not a model of clarity in its exposition of state law claims, and despite what Plaintiffs may argue in their briefs, the court's consideration of the preemption issue must be based solely on the allegations raised in the complaint. With regard to the

AO 72A
(Rev.8/82)

breach of contract claims, Plaintiffs appear to include both ERISA and non-ERISA covered patients. *See* Cmplt., ¶¶ 73-82. Obviously, there is a difference in the preemption analysis between these types of patients. For those individuals not covered by ERISA plans and for whom National Renal is an assignee or a third-party beneficiary, claims would not be preempted because they are not covered by ERISA.

However, for any patients who utilize ERISA plans, the entirety of National Renal's state law breach of contract claim is premised on its position as an assignee or third-party beneficiary of these patients. The law is clear that when a health care provider is suing in the shoes of a health plan benefit recipient, the ERISA preemption analysis is conducted as if the individual covered by the plan is asserting the claim. *See Hobbs v. Blue Cross Blue Shield*, 276 F.3d 1236, 1241 (11th Cir. 2001) (citing *HCA Health Care Servs. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001)). Here, the claim would clearly "relate to" the ERISA plan because National Renal, on behalf of the individual, is asserting that Blue Cross violated the plan insurance policy by reducing the reimbursement rate for out-of-network dialysis treatment. Both the individual and the insurance company are ERISA entities, and the court would have to consider the terms of the ERISA plan to adjudicate Plaintiffs' claims.

Plaintiffs are correct that the law does appear to carve out an exception for certain claims raised by health care providers, *see Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32

31

F.3d 1529 (11th Cir. 1994) (state law negligent misrepresentation claim brought by home health care provider against insurer under ERISA plan to recover charges for nursing care provided to an insured not preempted under ERISA because it would "too tenuously" affect ERISA plans), and *Memorial Hospital System v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990) (where hospital called insurance company before admitting patient and was assured that patient's visit would be covered, hospital's negligent misrepresentation claim against insurance company for denying coverage not preempted by ERISA), for example. However, these are not the types of claims Plaintiffs have raised in their complaint.

Therefore, the court concludes that Plaintiffs' state law breach of contract claims are preempted except to the extent Plaintiffs raise breach of contract claims in an assignee/third-party beneficiary capacity, on behalf of patients whose insurance plan is not covered by ERISA.

Similarly, the court must parse Plaintiffs' misrepresentation claim to see whether it is defensively preempted by ERISA. Plaintiffs aver that Blue Cross willfully and intentionally deceived National Renal regarding the material facts of its reduction in reimbursement rates for dialysis services so that National Renal would continue to provide those services to Blue Cross enrollees. Plaintiffs further claim that they relied on Blue Cross using certain terms in the marketing of its PPO and POS plans in accordance with the

AO 72A
(Rev.8/82)

customary meaning in the market and Blue Cross did not meet that expectation. *Id.*, ¶¶ 84-87.

This claim raises a closer question. To the extent that Plaintiffs claim Blue Cross misrepresented the terms of its insurance policy, the court would be required to analyze that policy, which obviously impacts an ERISA plan. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) (Texas wrongful discharge statute preempted because existence of benefit plan was "critical factor" in plaintiff's ability to establish liability under statute and statute related to ERISA plan because it required Court's inquiry to be directed to the plan); *Sanson v. General Motors Corp.*, 966 F.2d 618 (11th Cir. 1992) (same). However, in this context, National Renal is not stepping into the shoes of an ERISA entity and, in fact, is not an ERISA entity. *Jones*, however, seems to provide the answer to this question in noting that even fraudulent inducement claims raised against non-ERISA entities would impact relations among ERISA entities and therefore should be covered by ERISA. For example, a ruling that Blue Cross did or did not misrepresent the scope of its plan's coverage would certainly impact individuals covered under the plan. Therefore, the court finds that Plaintiffs' misrepresentation claim "relates to" an ERISA plan and is preempted by ERISA.

National Renal's Unfair and Deceptive Trade Practices Act claim is also premised on Blue Cross's conduct in marketing its PPO plans and "confusing" National Renal patients. National Renal further asserts that Defendant's actions violate Georgia's PPO

33

statute, O.C.G.A. § 33-30-23(a)(2), and can be addressed through Georgia's Unfair and Deceptive Trade Practices Act. Numerous courts have concluded that state law unfair trade claims "relate to" ERISA plans because they rely on the very existence of the plan in order to be viable. That is, the plan is the commercial transaction upon which the unfair trade claim is premised. *See*, *e.g.*, *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101 (2d Cir. 2008) (ERISA preempted retiree's state law claims, including unfair trade practices, because each claim "related to" ERISA plan as each was premised on plan's termination and resulting denial of benefits, each made explicit reference to the plan and each would require reference to plan in calculating any recovery); *Summer v. Carelink Health Plans, Inc.*, 461 F. Supp. 2d 482 (S.D.W.Va. 2006) (state law unfair trade claim preempted because it was entirely dependent on existence of plan and was alternative enforcement mechanism for ERISA claims); *Degrooth v. General Dynamics Corp.*, 837 F. Supp. 485 (D. Conn. 1993) (ERISA preempted claim under Connecticut's unfair trade statute arising out of reduction of benefits under employee welfare benefit plan); *National Alcoholism Programs/Cooper City, Florida, Inc. v. Palm Springs Hospital Employee Benefit Plan*, 825 F. Supp. 299 (S.D. Fla. 1993) (Florida unfair trade practices claim which arose from plan's alleged representations that proposed treatment was covered by plan and that treatment facility was covered facility preempted by ERISA since treatment facility would be required to prove existence of consumer transaction involving plan and damages would be based on amount

34

of potential benefits due under plan). For the same reasons, the court finds that Plaintiffs' unfair trade claim would also be preempted because it "relates to" an ERISA plan. To adjudicate Plaintiffs' unfair trade claim, the court would have to address the existence of the ERISA plan. Further, to the extent that Plaintiffs' claim is premised on the confusion that allegedly befell its patients, it thus affects the relationship between an ERISA plan and its beneficiaries.

In their quantum meruit and unjust enrichment claims, Plaintiffs contend that they have performed valuable dialysis services which have accrued to the benefit of Blue Cross in the form of insurance premiums paid by its enrollees, but that Blue Cross has failed to compensate National Renal for these services or has deprived them of the customary value of those services. *Id.*, ¶¶ 104-10. Again, however, these allegations are essentially a claim for wrongful denial of benefits promised under an ERISA-regulated plan. Whether National Renal was properly compensated for its dialysis services will require the court to consider the terms of Defendant's insurance plan. Because it therefore "relates to" an ERISA plan, the court finds that it is preempted.

Because the court finds that Plaintiffs' state law claims (but for non-ERISA breach of contract) are preempted by ERISA, the court need not consider Defendants' arguments that Plaintiffs' claims fail to state a cause of action.

### D. Summary

AO 72A
(Rev.8/82)

The court has not yet addressed Defendant's argument that Plaintiffs have failed to properly plead their ERISA and/or breach of contract claims because they have not identified the ERISA beneficiaries and plans that underlie their ERISA claim. The court finds some persuasion in this contention. As can be seen from the court's analysis above, whether policies are part of an ERISA plan is significant to the viability of the claim. Further, it is not clear from Plaintiffs' complaint that they allege any state law cause of action (other than breach of contract) for non-ERISA plans. The court has presumed that Plaintiffs do not raise such claims. Clearly, to be able to defend against Plaintiffs' claims, Defendant will need to know which patients were on which plans and whether they were covered by ERISA or not. Defendant will also need to know for which patients Plaintiffs have a written assignment of benefits and those for which Plaintiffs will assert they are entitled to the benefits despite the lack of written assignment.

The question is whether this information needs to be in the complaint and the court finds that it does not. Plaintiffs have alleged that some of their patients are covered by ERISA and some are not. The court has discussed that Plaintiffs' state law breach of contract claim for non-ERISA patients survives Defendant's motion to dismiss. The court has also concluded that Plaintiffs' ERISA claims for patients on a plan covered by ERISA also survive Defendant's motion to dismiss. The court does not find that *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), requires that a party plead policy number and other

such details in its complaint or produce written assignment of benefits with the complaint. *Twombly* held that a complaint "does not need detailed factual allegations," but those allegations made "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. The court finds Plaintiffs have done so here. *See also Watts v. Florida International University*, 495 F.3d 1289, 1295-96 (11th Cir. 2007) (describing that *Twombly* does not "impose a probability requirement at the pleading stage" but rather "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" a necessary element). Plaintiffs' remaining state law claims are preempted by ERISA and Plaintiffs' Medicare as a Secondary Payer Act cause of action fails to state a claim upon which relief can be granted.

AO 72A
(Rev.8/82)

**III.     Conclusion**

The court GRANTS IN PART AND DENIES IN PART Defendant's motion to dismiss [11] and DENIES Plaintiffs' motion for leave to file surreply [17]. Defendant is DIRECTED to ANSWER Plaintiffs' complaint within the prescribed time period.

**IT IS SO ORDERED** this 19th day of February 2009.

_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)